I'm going to try to allocate my time so that I talk about five or six minutes about the first procedural issues and then turn to the age discrimination summary judgment ruling of the district court. I realize that an abuse of discretion standard is difficult on procedural ruling, but here I've got, I think, just that. We do allege that the trial court abused its trial, innocent, severe injury to my law partner, Yona Rosen, that interfered with timely efforts to conduct deposition discovery. We're not talking here about written discovery. We're talking about deposition discovery that was very legitimately left until toward the end of a discovery period that was relatively short. We've asked the court to take judicial knowledge of a couple of things, and we think that it's important that the court do so, because those items cut against the rulings of the district court. In many cases, the district court did not explain why she did what she did. But we ask the court to take judicial knowledge of the fact that it is good practice to sequence discovery so that we do written discovery first and then we do deposition discovery. That's good. That's normal. There's nothing derelict about it. I read what you argued in the brief, and I read the district court's opinion. I looked further because, as you started off, abuse of discretion is difficult to show. On the strength of what you allege, I started trying to get my arms around exactly how you were dealing with it. Nobody disputes the injury to your law partner, but as I was looking at this timeline and so forth, it just didn't strike me as so off the map in terms of the district court's rulings vis-a-vis hundreds of cases that we see where the judge managing their cases, etc., makes a variety of rulings. I'm not saying it out there. I'm just saying on the strength of the brief, when I looked at everything and the timelines involved overall, setting dates, etc., etc., in the main, whether or not I would have done it or whatever, I was having trouble getting to the abuse of discretion here. Was it a good judgment or not? Taking that, that maybe I'm the only one who's not quite there, obviously you disagree that she didn't do what you asked, but showing that the injury and so forth, the rest of this, over the period of time, that's where I didn't necessarily connect. So you'll be able to help me get the in-between. Thank you for the opportunity, Your Honor. These rulings were connected, and there was a ripple effect or a domino effect between them, and so you really have to start by looking at the first ruling. The first ruling came on June 13th, and it was in response to a July 11th motion, and it's important to know what the judge said and what she didn't say. The motion said that, the thrust of the motion was, we've got this discovery to do, deposition discovery, no one has taken depositions yet, there's nothing really wrong with that, we were near the end of the period, and I broke my ankle in three places, and I'm in pain, and I can't focus and I can't travel, and I need a four-month extension. And the judge completely ignored that part of the motion in her ruling. Her ruling focused on and misstated the facts, saying that the parties had not started discovery, which was not true. There had been initial disclosures, the defendants had started discovery, we started written discovery. Written discovery wasn't the problem. The problem was that Rosen had a broken ankle, and Gillespie was me, and I had Rosen to do the deposition discovery, that was covered, she was going to do it, and then she broke her ankle. And on May 22nd, she had started to reach out to get discovery depositions taken, the other side hadn't even taken the deposition of Mr. Squires. That's where we were. And we were urging them to go ahead with that if they were going to do it, and we needed to take some depositions. So your Rosen initiated by email, which is the way we do things these days, and the other side ignored it. And then when she broke her ankle, she sent an email to the other side, and the other side ignored it. I mean, this is a situation where under Donde, which I know is a northern district rule, but it's something that we've come to think is good law, I'm expecting a response. I'm expecting the other side will certainly pick up the phone and say whether they oppose or don't oppose, and the other side simply didn't respond ever to Yelena Rosen's request for are you going to oppose or are you not going to oppose. And then when the judge denied the motion, that was the abuse of discretion. What we did is exactly what Judge Jones talked about years ago in the Geiserman case, which are the four factors. And we focus also on the thrust of those, which is whether there was due diligence. And I want to look first at that ripple effect, ruling number one, because it affected all the other ones. And on the due diligence, Gillespie and Rosen were handling this case, and it was moving along fine. I'm the trial lawyer. We tried a case, and your case, about a year ago, the Miller case. That was a case where Yelena Rosen did the discovery, and Al Gillespie tried the case. That's the way we operate. And it works out really well. What we didn't expect was for her to go into her garden wearing her flip flops and break her ankle in three places. And I can tell you, and this isn't just me talking now, this is in the record. This was all before the judge. Yelena Rosen was in severe pain. She showed up to handle the deposition of Jerry Squires and literally couldn't do it because she was late for the deposition due to the pain and her medication. And she was there, and she was in pain, and I handled that deposition. I covered it for her. And then I took these other depositions, even though the other side would not cooperate with us in two ways. Number one, they wouldn't get back to us. They said they would. They would not. They would not. We had a short time frame, and it was hurt. The judge gave us an extra 30 days, and that's like when someone says, I need a wheelchair, they give you a Band-Aid. We needed more than 30 days. We really did. And we had been diligent up until the point in time that fate struck. And what I'm asking the court to do is to treat lawyers the way that people are to be treated under the federal law. We've got the ADA, we've got the FMLA, and both of those take into account the fact that people sometimes get sick, sometimes they get hurt, sometimes they have disabilities, and when that happens, they are to be accommodated. I know you want to get to your substantive arguments first, but two quick questions on this. Does the record reflect that you call as well, or is it just emails? Called and emailed throughout this period of time. We had a one-on-one, look-you-in-the-eye conversation at Jury Squire's deposition where we say, will you get back to us tomorrow so we can get dates for these depositions we've got to take? They refused to bring them to us. We traveled. I got tickets, and the record totally reflects this. I asked you to look at tab 8 on our appendix, tab 7, 8, and 9 on our appendix. So, and I know I'm getting to the point where I... What's the best case to establish abusive discretion? It's a compelling case. How would we, what would be the case that would also contain a limiting principle so it didn't apply every time a lawyer said, you know, I've got the flu, and be nice, and accommodate? Your Honor, Fulman v. Davis is a Supreme Court case, and it's talking about Rule 15, but I think those principles apply. And I think our best case, our case, Fifth Circuit cases where abusive discretion was not found, such as the Griffin... What's the best case for finding abuse in this circumstance, but not making it a wide-open rule? The reasoning that was in the Campbell case and the Cole case, those are cited in the briefs. The reasonings there limit a ruling. The ruling here would be, in Griffin, we know that the negligence of a lawyer can be imputed to a client, and we're fine with that. We understand that. But we also think that if the law would give a client a break, if they, no pun intended, if they broke their ankle in three places. Lawyers are human beings. We don't, if I had known a young woman was going to break her ankle, I would have taken these depositions. I would have been the lawyer taking this discovery. We could do that. We can make those changes. But, Your Honor, a six-month period to conduct discovery doesn't mean we drop dead if we haven't, if we've got a full month left to go. That's time to go away, Your Honor. Well, move on to prejudice and the merits of your argument, please. Oh, thank you. Well, you know, Motion No. 2, which was the July the 27th motion, which was a joint motion for a two-months continuance and a 70-day continuance of the trial. It was a joint motion. You can't argue there would be prejudice on any of these things. On No. 1, they actually never opposed it. The judge made a ruling. I'm talking about prejudice to your side. Oh. Well, prejudice to our side was that we had, ultimately, it cost us our motion for leave to amend. And the reason for that is, and directly, the reason for that is we did not get Frediani's deposition until August the 16th. I took that in Chicago. I got his transcript by expedited mail on August the 19th and filed my motion for leave to amend three days later, citing the quid pro quo agreement, and the judge ignored the quid pro quo. And the quid pro quo, the quid on that was their motion for leave to amend their answer. Had they not done that, I didn't need to amend. We had a breach of contract case and they had not pledged statute of frauds. So I would have been able to win my case if they hadn't amended. And we honored our part of the quid pro quo agreement. So the damage was that we lost that claim, that fraud claim that ultimately we lost. That was the damage to it. All right. Thank you very much. I think this is important, and it's so important, because I'm a real life lawyer and I really do this stuff, and so does Your Honor Rosen, and we need courts to look at us as human beings, and when lightning strikes or when the ankle breaks, if at that point we had not, if the motion had been needed by something other than the oral discovery, it would have been different. We couldn't take that oral discovery of Frediani as soon as we would have liked, and the judge denied our motion for leave to amend because of the late stage or the stage of the proceedings. That's what she said. Your Honor, on point two, this is a novel situation for the district judge. I think it is, the judge ruled, one of her comments in the order was that defenses like Heiko et al. have got are commonplace in employment litigation. I have literally never seen a case where, in a termination case, a plaintiff says, I was fired and I'm suing because I was fired, and the defendant says, we didn't fire you, and we don't have any reasons to fire you. The closest I've come is that I've had a couple of people who said I was fired for my age or sex or national origin, and the defendant said, you didn't fire, you resigned. But here they didn't say that. Here Heiko freely admits he didn't resign. But you did have, he did have a three-year employment contract, and the three years was up, right? That's right. But the contract doesn't say, at the end of the contract, you're fired and you've agreed to that. No, it's just over. The contract is over, but employment, this is a fundamental piece of the ADEA, and Title VII, and all of our employment laws, and that is you don't have to have a contract to have protection under the laws. So the company certainly didn't have any obligation to extend that employment agreement, but it could not fire squires without a reason to pass muster under the . . . You do have a term, contract. It's a term. I really don't. What's your best authority for this? I mean, if somebody hires you as the lawyer for two years to advise them on, you know, corporate policies or something, and the contract ends, it ends. It doesn't matter if you're over the . . . The contract is. Correctly, your best authority for the fact you've got protection under the ADEA is that the ADEA protects you if you're at will or if you're not at will. And there's . . . But that's without a term, contract. That's without a contract or with a contract. The facts in this . . . Do you have a case on point on this? I've got the ADEA. Well, okay. And the ADEA says it applies to everyone, whether they have a contract or not. How specifically is the adverse employment step that you're claiming . . . Termination. . . . that you're claiming they terminated your client? Absolutely. Your Honor, if you look at what the judge did in this case, she started out in the first paragraph saying that Plaintiff Gerald Squires brings his employment discrimination action against his former employer after the employer refused to renew the employment agreement with Squires and instead offered the 70-year old a different position. Well, she didn't . . . They didn't offer him a different position of employment. They offered him a non-job, a claquemous, which is a Supreme Court case. And I . . . Pardon me? A non-job for $120,000 a year? Well, it's an independent contractor case without any benefits and without statutory protection. That's the problem. And he had a job that had statutory protection. The way this . . . To address the facts in a way that shows the facts in a light favorable to the plaintiff, the way the district court should have said, this is a suit for terminating Squires after he turned 70 and informed his employer that he planned to work to age 90 if his health permitted it, even without a contract. That's what this case was about. It was about a termination. And it was not about failure to renew. The . . . Even if . . . I think Patrick v. Riggs is directly in the point, and we've cited in our brief, and if an employer doesn't . . . When you say that's what this case is about, the animus you're perceiving is that he informed them he wanted to work to 90, but the person he informed, is the record clear that that person connected to the decision makers? Absolutely clear. Who was it that . . . Mark Dougherty, who was the Vice President of Human Resources, who testified that he talked to the decision maker, and his decision maker was his boss, it's Frediani. And he informed Frediani that Squires intended to continue to work. What's the best case that shows that the plaintiff's statement that he's 90 reflects age discrimination on behalf of the employer? He said I'm . . . He said I'm 90, but they didn't respond? We didn't say I'm 90. I'm sorry, you said I'm going to work till 90. Yes, sir. He had just turned 70. I know, but do you see my question? That's his statement to them. Right. Was there any . . . There's a nexus. Within a month after he makes that statement, he's terminated, and then we get to the changing reasons. And we've got to talk about changing reasons. There's never been a more shocking case of changing reasons than you've got here. On the one hand, we were unhappy with him. On the other hand, we were so happy with him, we wanted to give him a job. Mr. Gillespie, you kind of portioned your time a little bit differently, but at least to the fact that you have identified the changing topic, you won't be raising it for the first time on rebuttal. So you're good as far as that, but you're about to go into a full-blown, and you've got the red light. So when you come back up, because you have raised it in your direct, you can allocate some time to finish off what you want to say about that one. I appreciate it. All right. Thank you very much, Your Honor. Time moves fast. It does. All right. Ms. Doyle? Good morning, Your Honors. Good morning. May it please the Court. My name is Linda Doyle, and I'm here for the defense this morning, Your Honors. I will refer to all of them jointly as S-line. I'll start with the procedural argument in this case. As Your Honor correctly noted, the standard of review is abuse of discretion, and Mr. Squires has not shown it here. Contrary to Mr. Squires' assertion, the three orders that he appeals are not interconnected. And Mr. Squires' entire argument is based on the faulty premise that Mr. Frediani's deposition was necessary for him to plead fraudulent inducement. It was not. As Mr. Squires said in his papers, he appeals the three orders where the Court denied motions to modify the scheduling order. That order was initially issued on October 31, 2012, and it was modified once with regard to discovery on June 13. The first motion that Mr. Squires discusses is a motion he filed on June 11, 2013. There, he asked for a four-month extension, and two days later, the Court denied the extension. Mr. Squires complains a great deal that I did not return his phone call or Ms. Rosen's phone call on May 25, and so he waited until June 11 to file the motion. I don't recall whether or not I returned Ms. Rosen's phone calls. The record is replete with ample evidence that we talked to each other and he met each other constantly during the course of that summer. If I did not return that phone call, I would not have waited until June 11 to file the motion, and there's nothing in the Court's order to suggest that my delay in making the phone call is what inspired her to deny the motion. On July 29, the parties filed a joint motion for an extension of the discovery and the case deadlines in the case. The Court immediately denied the motion and said that no further extensions would be granted absent exigent circumstances. Then on August 22, Mr. Squires filed his motion to amend the complaint to plead fraudulent inducement. That motion was filed after discovery closed, after the motion for summary judgment was on file, and exactly one business day before his response was due. Well, let me just ask you a question. I mean, you were aware of the severity of Ms. Rosen's injuries. Yes, I was. So why were you somewhat intransigent about delaying things? Well, Your Honor, I wasn't intransigent. In fact, less than a month after I filed my joint motion for an extension of discovery, it was a difficult summer for Ms. Rosen because she broke her ankle. It was a difficult summer for me because my father was ill and ultimately died. We cooperated with each other in discovery. I was not intransigent. By the time Ms. Rosen—first of all, I didn't oppose the motion. I just didn't join it. And when Ms. Rosen asked for the extension, we still had two months left in discovery. There was no reason to assume that we couldn't have finished those motions. We did. We finished the depositions that summer. So there was no prejudice by the Court's denial of those motions. That's critical in this case, and it's why these motions are not connected. As the Court noted, the standard is abuse of discretion, and this circuit is a high standard. Let me ask you a question so I understand your last response. When she asked for the extension, you said there was two months left. So within her motion, was she projecting some reason why the two months wouldn't occur or whatever, just asking for the two months more? Right. When Ms. Rosen initially approached us with regard to the motion, I think on May 25th, there were still two months left in discovery. She asked for four additional months. The Court denied it, finding no good cause for your ability not to meet my scheduling order. There's two months more left, but I'll give you another month. That's what happened with regard to that first motion. The summer continued to be difficult for all of the parties on a personal level, all human. So two weeks later, we filed a joint motion for three more months. Mr. Gillespie said to me, if you join this motion, she will grant it, and I did. She didn't grant it. She denied it that day, told the parties, get to discovery and finish it. I'm not going to grant any further requests, and we did. You're saying even-handed, and trial judges are being told by higher courts all the time, keep it moving. Even-handed, Your Honor, yes, and no impact. At the end of the day, we kept it moving and got the discovery in the case. What was the full period of discovery here? In other words, taking the extension, the motion, the extension account from the time of the order. I mean, how much? Six months? I mean, what's ballpark? I'm trying to get a sense. The full period of discovery, taking into account the original time period, and then there was an agreed extension, and of course, she denied. I'm trying to get a sense. I believe ten months. Ten months, okay. Ten months. We had ten months for discovery in the case. That's what I'm trying to get to. That's right. All right. And now I'll turn to the critical order in the case that Mr. Squires complains about most loudly. That is the order denying his motion to amend the complaint. It is true that on June 20th, S-Line agreed not to contest a motion by Mr. Squires to amend the complaint. It is not true that we reneged on that agreement. First, we assumed that it would be filed within a reasonable time. The motion that I asked for, the quid pro quo, I filed it in a week. And explicit in the agreement, it is written into the document in the record was that the motion would be presented by Mr. Squires if something came up in the course of depositions, something new. Nothing came up. Mr. Squires' argument that the Frediani deposition delay somehow prejudiced him is an absolute red herring. He learned nothing new in that deposition that he needed to plead fraud. The record is clear and demonstrates this abundantly. The parties engaged in motion to dismiss practice in the beginning of the case. Actually, S-Line filed two different motions to dismiss. In response to that motion, so we're talking in September of 2012, Mr. Squires wrote in response to our motion to dismiss that he thought he had a fraud claim. After motion to dismiss practice ended on January 8th, 2013, S-Line answered the complaint, and we denied the oral promise. We denied under oath that S-Line, Mr. Frediani, or anyone made a promise to Mr. Squires with regard to commissions. That is all he needed to file the fraud claim. He had it in January. Mr. Frediani did testify during his deposition that he denied the promise. Mr. Squires insists, but cites absolutely no case law for the authority that he needed sworn testimony to file that amendment. He did not. There's no authority for that in this circuit or any other circuit that we could find. It is not true that one needs sworn testimony to file a complaint. Mr. Squires didn't have sworn testimony on the age claim. He didn't have sworn testimony on the breach of contract claim. It's simply not true. The delay is a red herring. The delay argument is a red herring. Again, he knew on January 8th, when we answered the complaint, that we denied the promise. Mr. Frediani simply repeated it under oath, as did every other S-Line witness who testified in the case. He tries to blame S-Line for the delay, arguing he had difficulty scheduling those depositions. Beyond the red herring, the argument has no merit. Mr. Squires did nothing in this case until May 25th. He noticed no discovery. He noticed written discovery on the exact last day that he could. Then the parties proceeded to take depositions. We had scheduling difficulty on both sides. Ms. Rosen broke her ankle. My father was very sick and ultimately died. Mr. Gillespie had an arbitration. Either Mr. Gillespie or Ms. Rosen had a graduation. I cannot remember who, and there was a Fourth of July holiday, and they were not available. We both had scheduling conflicts. We worked together to schedule the depositions, and these depositions did not matter with regard to the fraud claim. And contrary to Mr. Squires' claim in his brief, there is no doubt that S-Line would have been prejudiced by the amendment late in the game in this case. Our summary judgment motion was filed. We obviously would have had to engage in motion practice to move to dismiss this claim had it been filed. We may have had to take some discovery. I don't know, but no doubt we would have had to engage in motion practice. This Court has said that additional costs equal prejudice. This Court has also said that there is no abuse of discretion when the denial of the motion to amend is made after summary judgment is filed. That's the Sullivan and Cromwell Cresswell case, 1993. That is exactly what happened here. Mr. Squires complains bitterly about unfairness. There was nothing unfair about this. He was not diligent in prosecuting his claims. He is right that leave to amend is freely granted, but not when it's untimely and there's no good cause for the delay, which is exactly what the judge found here, and she was correct, and we ask the Court to affirm on those grounds. Now I'll turn to the age claim. Mr. Squires believes that he was discriminated based upon his age, but he has absolutely no evidence of age bias on the part of anyone at S-Line. A de novo review of the record shows quite clearly that the District Court was correct. The Court found, despite protests from S-Line, that Mr. Squires stated a prima facie case. There is no doubt that S-Line argued that it did not terminate Mr. Squires. S-Line still Mr. Squires' employment agreement expired by its terms on October 12th. Mr. Frediani chose not to renew it for reasons stated in the record. Mr. Frediani then offered Mr. Squires an opportunity to stay at S-Line in a different relationship, an independent sales representative relationship for $120,000 a year plus commissions. Mr. Squires and Mr. Frediani agreed to that. At one point, Mr. Squires asked for higher commissions for certain sales for certain customers. Mr. Frediani agreed. Negotiations continued. Finally, Mr. Frediani said to Mr. Squires in an email, which is in the record, accept this final offer by this date. Mr. Squires did not do so, continued to negotiate, and on September 30th, Mr. Frediani sent Mr. Squires an email saying, I am withdrawing the offer because quite clearly we cannot come up with an agreement to make you happy. Under those undisputed facts, S-Line believes that it did not terminate Mr. Squires. However, as the district court pointed out, we appropriately argued in the alternative that even if we did terminate him, we had legitimate reasons for it stated in the record, and those reasons are unrefuted. In that moment in the case, the district court then appropriately shifted the burden of persuasion to Mr. Squires to show pretext. Mr. Squires cannot meet that burden. As your honors well know, at this point, Mr. Squires had a very high burden. The burden to state a prima facie case is easy, relatively speaking. The burden to state a legitimate discriminatory reason is easy, relatively speaking. The burden to show pretext is higher. In this court, Mr. Squires had two opportunities. He had to show that discrimination more than likely motivated the decision or that the arguments were unworthy of credence. His credence argument rests on the faulty premise that simply because we made an alternative argument that we didn't terminate him, we're not telling the truth. There's absolutely nothing in the record to support that. First, he argues that Mr. Frediani's affidavit is not consistent with other reasons stated earlier in the case and other reasons that S-Line witnesses gave in their deposition testimony. That argument is not supported by the facts in the record. There's no shift in reasons here. We said he wasn't terminated, but said even if he was, here's why. On four different occasions from the very beginning of the case, S-Line provided the exact same testimony as to why the relationship ended, stating we didn't terminate Mr. Squires, but stating the employment agreement ended. We decided not to renew it. We offered him a new deal, and he turned it down. We said that in our answer on January 8th. We said the exact same thing almost verbatim in our interrogatories on January 16th. On January 29th, Mr. Frediani filed an affidavit in this case with our summary judgment motion. He said those three things, and for the first time added context as to why. He said... Does the record contain Frediani saying that I never intended to have him after the three-year term? Yes. Mr. Frediani said in the record that I never intended to have him continue. I never intended to renew the employment agreement. But is that inconsistent with the fact the agreement contemplated automatic extensions of one year, or that they offered him the independent contractor position? I don't think it's inconsistent. The agreement did say the agreement would continue unless not renewed. One-year period? One-year periods. And Mr. Frediani said I never intended to renew it, and I offered him a deal that made more economic sense for him and for me. Mr. Frediani testified that the independent contractor relationship, and this is what he said in his affidavit... What was the salary under the agreement? $400,000 a year. And in the record, it's important to note that that $400,000 a year was part of the transaction. This was a sale where no real cash was exchanged. S-Line assumed the debt of Mr. Squires and JPS Corporation, which Mr. Squires and his spouse had personally guaranteed, and gave him a very rich employment contract, $400,000 a year, three times more than any other sales representative in the company made. It was going to end and change economically at the end of the three-year term. That is not in dispute in the case. So, Mr. Frediani filed an affidavit providing additional context, never changing the reasons, never admitting that he terminated Mr. Squires, but saying here's why. And it's important to note that Mr. Squires doesn't dispute the here's why. He acknowledges they clashed over expense accounts. They had arguments and emails in the record about whether or not it was appropriate for Mr. Squires to expense season tickets to the Dallas Cowboys, whether or not it was appropriate to expense dinners with his wife on a Saturday evening, whether or not it was appropriate to entertain clients at, I think, the Arkansas Derby or maybe the Kentucky Derby. That's in the record. Mr. Squires does not dispute that he didn't enjoy being managed. He was a business owner who sold his company. Mr. Squires does not dispute that Mr. Frediani and he were unhappy with each other in those contexts. Then, on August 16th, Mr. Frediani and the S-line witnesses were deposed. They all said the same thing, consistent with the answer, consistent with the interrogatories. The contract ended. We decided not to renew it. We offered him a different deal. He turned it down and he left the company. Is there any law that you're aware of that holds that the termination of an employment contract can nevertheless be a termination for purposes of discrimination laws? No, Your Honor. We argued in our motion to dismiss that point and lost. We argued that there was no adverse action because the agreement ended and he walked away. We moved to dismiss on those grounds and the court disagreed, so we concede that point. You concede that? We concede that we argued in our motion to dismiss that the AIDS discrimination claim fails because we didn't take any adverse action. We lost that. We then moved to— What was the court's citation? Did she cite anything in denying the motion to dismiss? I honestly don't remember what she cited. What she said was, your events, deciding not to renew, making an offer to him, and then him turning it down and walking away is an adverse action. What she said was it ended the employment relationship, and therefore those decisions have to be viewed under the lens of were they motivated by AIDS discrimination. Minister Squires argues that they were pretext, and as I stated earlier, pretext is a very high burden. He needs to prove unworthy of credence, not true, motivated by AIDS. He has to create a fact issue. Yes, exactly. He has to create a fact issue, and he relies on the shifting reasons. Our He points to two employees who he says called him the old guy, and he responded calling them the young guys. He presented no evidence that Mr. Frediani said those things, that Mr. Frediani knew about them, that Mr. Frediani believed them or acted upon them. It's undisputed that Mr. Frediani is the decision maker in this case. Mr. Squires also says he believes he was hired to train younger employees and then be put out to pasture because he was old. He has no evidence that Mr. Frediani believed that or acted on it, and his belief is not pretext. He also says that he told Mr. Doherty he wanted to work until 90, and he thinks Mr. Doherty said it to Frediani. He's not sure. Even if Mr. Squires said it directly to Mr. Frediani, Mr. Squires' statements that he was 70 and wanted to work until 90 are not evidence of pretext. He also argues that he had this written employment agreement. Even though it expired, we should let him be an at-will employee, and because we didn't, it must have been motivated by age. Again, it's simply a belief, and the belief, Your Honors, is not enough. There is no doubt that the parties argued over whether Mr. Squires was terminated. S-Line took the position he wasn't, but their reasons never shifted. They always acknowledged their actions, and when the court concluded that those actions led to the end of the employment relationship, and therefore must be tested for age discrimination, we conceded. Then we met our burden to offer legitimate non-discriminatory reasons for the decision, and Mr. Squires simply failed to show pretext. His beliefs are not enough. If I can turn just to the, very quickly, to the procedural argument. One of the things that it's important for the court to note, if the court were to decide that Your Honor abused her discretion and remanded, the result would be the same. Mr. Squires concedes that the statute of frauds barred his breach of contract claim. He admits that, and he withdrew it. The statute of frauds also bars a fraudulent inducement claim. The Texas Supreme Court has held in two cases, Hassee v. Glazner and Denergy v. Yates, which is the most recent case, 2013, that the statute of frauds bars a fraud claim if the plaintiff seeks benefit of the bargain damages. Those are the exact damages Mr. Squires seeks here. Under the statute of frauds, that promise must be in writing. It's undisputed that it's not in writing here. Therefore, it's barred, and any remand would be futile. Thank you very much. All right. Thank you very much. Let's see you back up a little. The last thing counsel said wasn't in her brief, and it's not correct. This is an area that I've tried the Vernon case versus Metro Airlines. I know that the statute of frauds doesn't apply to rule out the fraud claim that we were trying to plead. But anyway, that wasn't fair game because that wasn't in her brief, and we didn't address it in ours. Now, in terms of the procedural point, a couple of things. Actually, four things I want to point out very quickly. Number one, counsel was wrong when she said there was two months left. May the 22nd is 31 days from June 21. I won't tell you how to use your time, but I'm going to remind you, you ran out of time on your other merits point. You spent all of this time on the procedure. If you get to the end with a red light, I'm not necessarily going to give you more time. I just don't want you to end up not making an argument if you plan to make it. But use the time however you see fit. Thank you, Your Honor. Actually, the other thing that she said, and I'll be brief on this, was that there was about ten months for discovery. That's not accurate. October 31st was the date that the search warning order came out. June 21 was the discovery cutoff. But more importantly, the answer, the motion to dismiss was not denied until December 18th. They didn't file their answer until January 8th. And this is very important. The deadline to amend was December 31. So we had to have leave to amend in order to get this case amended because the deadline for amendment came before we even started discovery. And finally, on the procedural point, Judge Higgins asked a question about how do we limit it. I think you go back and look at Gieserman, which is great law. It's still the law. And the court here did not apply Gieserman. If you apply Gieserman on each of the four factors, the judge didn't do the reasoning, but the reasoning would favor the plaintiff's position on all of those. Now, on the age discrimination claim, I think it's really important to focus on the first question that Your Honor asked about, you know, what is my authority for the position that when your contract ends you still have a job. The policy implications, if the court rules that it is when your contract expires, you're terminated and the ADA doesn't protect you, the policy implications mean that you better not be getting employment agreements. If you have an employment agreement, you're a lesser citizen. All of a sudden when your employment agreement ends through good cause, no cause, or no cause at all, then you're unprotected by the ADA. That would be the effect of the ruling. Well, no, it says that you have the right to make a contract, but I agree there might be some basis for misuse. But on the other hand, this man is not a victim of anything. He sold his company for over $5 million. Tough cases make tough law, Your Honor. But I would say that there are a lot of people out there who don't get paid a lot and they have an employment agreement. When that employment agreement ends, they still have a job, thank goodness. Now, one of the things that counsel said, and I'm going to address it in rebuttal, is she made a point that Heiko et al. denies that they terminated him. Well, that's a fact issue. That's a fact issue for a jury to decide. If they want to argue that they didn't terminate this man, even though he had a job until all of a sudden he didn't have a job, he used to have benefits and now he doesn't have benefits, he didn't resign and they did it to him. If they want to make that argument, which of course they do, that has to go to a jury. So we welcome that. The court was cognizant of the fact that there were inconsistencies between these, between the testimony of Frediani in his affidavit versus Frediani in his deposition. Other cases, we're looking for differences between what one person said and what another person said. Here it's, you know, which Frediani do you believe? Do you believe him on his affidavit where he says he was unhappy with squires or in his deposition where he said he liked him so much he had no complaints? My time is out. I respect your honors on that and I so apologize for going over. Thank you very much. All right. Thank you, counsel. It's an interesting case. We appreciate the briefing and argument. It will be submitted.